IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 18, 2021 Session

## STATE OF TENNESSEE v. SHANNON BRUCE FOSTER

**Appeal from the Criminal Court for Knox County**
**No. 112413     Bobby R. McGee, Judge**

_____

### No. E2020-00304-CCA-R3-CD
_____

The Defendant, Shannon Bruce Foster, was convicted by a Knox County Criminal Court jury of second degree murder, a Class A felony. *See* T.C.A. § 39-13-210 (2018). The Defendant was sentenced to seventeen years' incarceration. On appeal, he contends that (1) the evidence is insufficient to support his conviction, (2) the trial court erred by instructing the jury that he had the duty to retreat before engaging in self-defense, and (3) the trial court erred by admitting a photograph depicting the victim with his young children. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Joshua Hedrick, for the appellant, Shannon Bruce Foster.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Charme Allen, District Attorney General, Ashley McDermott and Mitchell Eisenberg, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

This case arises from the December 11, 2016 shooting death of Ray Knox, at which time the Defendant was age eighteen. The Defendant did not deny shooting the victim. Rather, he asserted that he acted in self-defense after confronting the victim about the victim's assaulting the Defendant's mother shortly before the shooting.

At the trial, Jamichael Gary, the victim's brother, testified that in December 2016, the victim lived with their mother, Tammy Logan, and worked at a "pallet plant." Mr. Gary said that he saw the victim daily, including on December 10. Mr. Gary recalled that

the victim went Christmas shopping after work and that they saw each other at a liquor store around 11:00 p.m. Mr. Gary said that the victim appeared "[c]ool, laid back" and that "anyone would want to be around [the victim] at the time." Mr. Gary recalled that Delise Foster,[1] the Defendant's mother, and Neshia Hampton were with the victim and that the women likewise appeared "[c]ool." Mr. Gary recalled that everyone "had good attitudes, good vibes." Mr. Gary said that his longtime girlfriend, Semone Bragg, was with him at the liquor store and that they went home after leaving the store.

Mr. Gary testified that at an unspecified time after leaving the liquor store, he received a telephone call from the victim, who stated he needed Mr. Gary. Mr. Gary said that the victim was calm and that Mr. Gary did not hear any "drama in the background or nothing." Mr. Gary said that he and Ms. Bragg left home and drove to their cousin's home in the Lonsdale area because the victim reported being at the cousin's home. Mr. Gary said that when he and Ms. Bragg arrived, he heard voices coming from down the street, that he walked toward the voices, that he saw Ms. Foster and Ms. Hampton, and that Ms. Foster sat on the driver's seat of a car and talked on a cell phone. Mr. Gary said that he asked what had happened and that Ms. Foster told him to "get your brother. . . . [H]e's going to get F'd up if you don't get him." Mr. Gary said that Ms. Foster stated she was going to call the victim's probation officer. Mr. Gary said that he walked toward a park, that he saw the victim, and that the victim said, "F her." Mr. Gary said that the victim was still "cool," "happy he got relief," and "didn't really want to be bothered no more." Mr. Gary said that he and the victim left the area in Mr. Gary's car. Mr. Gary stated that he "probably" saw Ms. Foster's hair lying on the street the following day.

Mr. Gary testified that he drove the victim to their mother's home around midnight, that the drive lasted about four to five minutes, and that the victim appeared "cool." Mr. Gary said that during the drive, Ms. Foster called the victim's cell phone multiple times and that the victim did not answer. Mr. Gary said that after dropping off the victim, he and Ms. Bragg drove home, which was about a ten-minute drive. Mr. Gary said that just after retiring for bed, he received a telephone call, during which he learned the victim had been shot at Mr. Gary's mother's home.

Mr. Gary testified that the victim and Ms. Foster's relationship was "horrible, but cool at the same time." Mr. Gary said that the victim and Ms. Foster drank alcohol and that Ms. Foster was "the type . . . [who] talk[ed] a little crazier or whatever." Mr. Gary said that "they" fought, that they broke "windows out and stuff," and that they did "it to each other." Mr. Gary said it was a violent relationship. He said that after he dropped off the victim at their mother's home, Mr. Gary thought it could have been possible for "something else" to occur. Mr. Gary said that the victim wanted to remove himself from the situation and that Mr. Gary helped the victim accomplish this. Mr. Gary identified a

---

[1] Other evidence showed that Ms. Foster was also known as Ms. Thomas. We use Ms. Foster for consistency.

photograph of the victim with the victim's two young children. The photograph was received as an exhibit.

On cross-examination, Mr. Gary did not dispute his police statement, in which he told the police that he received the telephone call from the victim around 12:30 a.m. and dropped off the victim at 12:45 a.m. Mr. Gary said that the following day, he returned to where he had picked up the victim and that he saw a portion of Ms. Foster's hair lying on the street. He said that if a portion Ms. Foster's hair were found inside a car, the hair inside the car was in addition to the hair he saw on the street. Mr. Gary said that although the victim and Ms. Foster had a violent relationship, the violence was not usually "this bad" and that their disputes involved vandalism to each other's property.

On redirect examination, Mr. Gary clarified that he remained at the location where he picked up the victim for about two minutes before driving the victim to their mother's home. Mr. Gary said that the victim walked inside their mother's home, that the victim was calm, and that he and the victim shook hands before Mr. Gary left.

Semone Bragg testified that at the time of the shooting, she lived with Mr. Gary and her three children. Her testimony was consistent with Mr. Gary's testimony regarding the events leading to the late-night telephone call from the victim requesting Mr. Gary's assistance. Ms. Bragg recalled that the victim and Ms. Foster were happy when Ms. Bragg saw them at the liquor store.

Ms. Bragg testified that the victim called Mr. Gary around midnight and that Mr. Gary asked her to drive him to pick up the victim. She said that when they arrived to pick up the victim, Mr. Gary walked toward the victim. She said that she was there for about five minutes before driving the victim to the victim's mother's home. Ms. Bragg said that she did not see Ms. Foster, the Defendant, or an orange-colored vehicle.

Ms. Bragg testified that while inside her car, the victim said his relationship with Ms. Foster "was over." Ms. Bragg recalled that the victim was not upset and had a "regular cool demeanor." She said that she drove to the victim's mother's home and that as they arrived, the victim said Ms. Foster was calling him. Ms. Bragg said that she and Mr. Gary returned to their home and prepared to go to bed for the evening, that Mr. Gary received a telephone call, and that they returned to the victim's mother's home.

On cross-examination, Ms. Bragg reviewed her police statement. When asked if she knew why the victim was "so mad," she said that she was not present when the victim and Ms. Foster argued and that the victim was not angry when he entered her car.

Tammy Logan, the victim and Mr. Gary's mother, testified that at the time of the shooting, she lived with the victim and her husband, Terry Logan. She said the victim was age thirty-two and worked at a pallet plant at the time of his death. She said that at the time

of the shooting, the victim and Ms. Foster had been in a romantic relationship for about one year, that the victim's son was age six and the victim's daughter was age eleven, and that the victim provided for his children.

Ms. Logan testified that in the evening hours on December 10, the victim and Ms. Foster came to the home to drop off Christmas gifts, that they left, and that she did not speak to the victim again until the victim called around 12:15 a.m. asking her to unlock the door to her home. She said that she unlocked the door, returned to her bedroom, and waited for the victim to arrive. She said that it was nearly 1:00 a.m. when the victim arrived, that she heard the victim moving around in the kitchen, and that she heard a knock on the front door. She said that she listened to determine whether the victim was going to open the door and that the knock became "more physical" after a brief pause. She said that she left her bedroom and that she saw the victim leave the home. She said that she looked out her bedroom window and that she saw the victim, the Defendant, and Ms. Foster arguing outside. Ms. Logan said Ms. Hampton was outside, too. Ms. Logan said the argument was verbal and did not involve physical contact. She stated that she said, "Y'all need to leave," before threatening to call the police. She said that initially, she did not know the Defendant was Ms. Foster's son but that she heard the victim tell Ms. Foster, "You better get your F'g son." Ms. Logan said that Ms. Foster argued with the victim and that Ms. Logan heard the victim say the Defendant was not going to shoot the victim with "that F'g gun." Ms. Logan said that she looked out the front door and saw the Defendant holding a handgun. She said that she could not hear most of what was said during the argument but that she heard the Defendant tell the victim to stop disrespecting the Defendant's mother.

Ms. Logan identified a photograph of the exterior of her home and identified where the Defendant, Ms. Foster, Ms. Hampton, and the victim stood. She likewise identified her, her husband's, and Ms. Foster's vehicles in the photograph. Ms. Logan said that at the time of the shooting, a tan-orange-colored car with its headlights on was parked along the roadway.

Ms. Logan testified that initially, the Defendant held the handgun "down at his side" and that the argument between the victim and the Defendant was verbal. She said that she first saw the handgun when she stood beside her husband's car, which was where the Defendant, Ms. Foster, and the victim stood, and that after she saw the gun, she told Ms. Foster "to get her son" and not to bring "this" around Ms. Logan's home. Ms. Logan said Ms. Foster pushed the Defendant back. Ms. Logan said that she stood between the victim, the Defendant, and Ms. Foster in an effort to "break them up." Ms. Logan said that she attempted to get the victim to go inside the house and that he cooperated, although the verbal argument persisted. Ms. Logan said that Ms. Foster successfully got the Defendant to go to the car, that Ms. Foster stated she and the Defendant were leaving, and that Ms. Logan "got . . . [the victim] to calm down." Ms. Logan recalled that the Defendant and Ms. Foster entered the car, that the victim stood on the front porch, that Ms. Foster said something to the victim, and that the victim "broke back loose from [Ms. Logan] and said

-4-

what he had to say to [Ms. Foster]." Ms. Logan did not recall what the victim and Ms. Foster said to each other but recalled that the victim said, "F this F'g s---," as he jumped off of the porch. Ms. Logan said that after the victim "jerked" away from her and jumped off the porch, the victim removed his shirt. Ms. Logan said that at this juncture, she knew the victim was angry and that she went inside to call the police. She recalled that she was outside for ten to fifteen minutes before she went inside to call the police. She said she called the police because the Defendant had a handgun and because "they" would not leave.

Ms. Logan testified that by the time she called 9-1-1, she heard three gunshots. She stated that she accidentally hung up on the 9-1-1 dispatcher but called again to inform the police that the victim had been shot. Recordings of the 9-1-1 calls were received as an exhibit and played for the jury.

Ms. Logan testified that she never saw the victim make physical contact with Ms. Foster and the Defendant. Ms. Logan said that at the time of the shooting, the victim stood near the Defendant's car and that the Defendant was inside his car. She said that the Defendant left the scene and that Ms. Foster performed CPR on the victim. Ms. Logan said she knew Ms. Foster was intoxicated at the time of the shooting.

On cross-examination, Ms. Logan testified that the victim arrived at around 1:00 a.m. and that she did not speak to him before he left. She said the victim did not appear intoxicated but agreed the victim was angry. She denied telling the police near the time of the shooting that the victim was "drunk and angry, yelling F this and F that." A portion of Ms. Logan's recorded police statement was played for the jury. In the recording, Ms. Logan stated that the victim was angry, but she did not state he was intoxicated.

Ms. Logan testified that the Defendant walked to his car as though he were leaving and that at this juncture, the victim was "real angry" and "hadn't calmed down." She said that after the victim was on the porch, Ms. Foster "started back mouthing" at the victim, that the victim "stirred back up," and that the victim was "real angry" and "snatched away" from Ms. Logan. She agreed that as she attempted to hold back the victim, the victim said, "F this – F this s---." She said the victim's statement caused her to call the police.

Ms. Logan testified that she called the police because the Defendant possessed the handgun but that she also called the police because the victim was angry, jerked away from her, and yelled profanities. She explained that the victim became "real angry" when he was upset and that she knew she had to call to the police when she could not hold back the victim because "once he [got] like that, can't . . . nobody stop him."

Knoxville Police Officer Ryan Ayers testified that he responded to the scene, that the victim had suffered at least one gunshot wound, and that Ms. Foster performed CPR. Officer Ayers said that he separated two women at the scene and that he spoke to Ms.

Foster, who stated the shooter left on foot. He said that the description of the shooter provided to him was a black man, who was shirtless and wearing gray cut-off shorts.

The dash camera recording from Officer Ayers's police cruiser was played for the jury. The recording depicted Officer Ayers's traveling to the scene, a woman waving the officer to turn into the driveway, and a person performing CPR on the victim. Officer Ayers said that Ms. Foster said, "I can't breathe," and that he pulled her away from the victim in order for someone else to continue CPR. Officer Ayers explained that he spoke to Ms. Foster and Ms. Logan and that he asked for the victim's and the shooter's identities. He said that Ms. Foster was in a "very excited state," was stressed, and provided "nonverbal communication" relative to the Defendant's whereabouts.

Terry Logan, the victim's stepfather, testified that at an unspecified time, he heard a knock on the front door. He said that the victim was outside, that Mr. Logan opened the door for the victim, that the victim went to sleep on the couch, and that Mr. Logan returned to his bedroom. He said that about thirty minutes later, he heard a knock on the front door followed by a knock on the window, that the victim went outside, and that Mr. Logan walked to the door. Mr. Logan said that he returned to bed after he saw the victim and Ms. Foster speaking, that he told Ms. Logan, who was inside the home, and that they attempted to return to sleep. Mr. Logan said, though, that he "heard louder arguments" and that Ms. Logan went outside, told the victim and Ms. Foster to "stop all that," and threatened to call the police.

Mr. Logan testified that he left the home, stood between the victim and the Defendant, and told the Defendant, "Dude, why don't you just leave." Mr. Logan said that the Defendant "started walking toward" the Defendant's car, that Mr. Logan turned and walked inside, and that Ms. Logan had already gone inside. Mr. Logan said that he heard two or three gunshots five to ten minutes later. He said that he did not see any physical altercations among the Defendant, the victim, and Ms. Foster. Mr. Logan said that the Defendant was gone when Mr. Logan walked outside again.

On cross-examination, Mr. Logan testified that the victim had already removed his shirt when Mr. Logan went outside. Mr. Logan said that he stood between the victim and the Defendant and told the Defendant to leave. Mr. Logan said that he had been inside when the victim had removed his shirt. Mr. Logan said that he was afraid to approach the Defendant because Mr. Logan did not know the Defendant and did not know why the Defendant was there. Mr. Logan said that when he asked the Defendant to leave, the Defendant walked to his car and opened the door and that Mr. Logan went inside the home.

Knoxville Police Investigator Jeff Day testified that he responded to the scene, that the victim was deceased when he arrived, and that he saw two cartridge casings. Investigator Day said that one casing was less than ten feet from the victim and that the second was approximately twelve to fifteen feet from the victim. He said that a portion of

a bullet was recovered from the driver's seat of the Ford Explorer at the scene.[2]  He said that there were two bullet holes in the passenger side of the Explorer and that based upon the location of the holes, the bullets traveled at a forty-five-degree angle from behind the rear passenger side into the door, traveled up into the headliner, and fell onto the seat of the Explorer.  He stated that a second bullet defect was on the passenger-side door and that the bullet traveled into the headliner of the Explorer.  In his opinion, the gunshots were fired at an approximate forty-five-degree angle "behind the vehicle to the rear passenger side[.]"  He said that one bullet was found in the driver's seat, that a bullet fragment was found inside the headliner, and that a bullet fragment was recovered from the victim's body.

Knoxville Police Evidence Technician Bethany Simmons testified that the victim's body lay near the front passenger door of the Explorer when she arrived at the scene.  She identified multiple photographs of the scene, which were received as exhibits and which showed, in relevant part, a strand of hair on the front passenger seat.  She stated that hair strands were found on the driver's side floorboard.  She said that the victim suffered gunshot wounds to the chest and shoulder and had scratches and abrasions on his fingers.  She stated that the nine-millimeter cartridge casings were recovered from the scene.  She identified a white t-shirt, a coat, a black hooded jacket, and a cap that lay on the driveway.

Ms. Simmons testified that she photographed Ms. Foster at the police station.  Ms. Simmons stated that Ms. Foster had missing braids in multiple areas on her head and that the braids in her hair appeared to match the strands of hair found inside the Explorer.  Photographs of Ms. Foster's head showed exposed areas of her scalp.

Ms. Simmons testified that she went to another home to process an orange car, which had been driven by the Defendant, at 11:00 p.m. the night after the shooting.  Photographs of the car were received as an exhibit.  She did not find any handguns inside the car.

On cross-examination, Ms. Simmons testified that the clothes found on the driveway were not removed by medical personnel because the clothes had not been cut from the victim's body.  She said that the initials "UGC" were embroidered on the blue cap found on the driveway.  She agreed that photographs of the victim showed a stomach tattoo reflecting "107 WS UGC" and an arm tattoo reflecting "UG."

Knoxville Police Sergeant Brian Dalton, an expert in forensic handgun and tool mark examination, testified that he could not determine whether the two cartridge casings recovered from the scene were fired from the same handgun.  He said that his analysis of the two fragments recovered from the Explorer and the single bullet recovered from the victim's body showed that the bullet from the victim's body and the fragment found on the

---

[2] Other evidence showed that the Explorer belonged to Ms. Foster.

driver's seat were fired from the same handgun. He said that he could not determine whether the bullet fragment recovered from the visor/headliner was fired from the same handgun as the remaining bullet fragment from the Explorer and the bullet from the victim's body. He was not provided a handgun for analysis. He agreed that the two bullet fragments could have been from the same bullet but that his analysis was inconclusive.

Knoxville Police Investigator Brandon Wardlaw testified that he responded to the scene and learned that the Defendant had shot the victim. Investigator Wardlaw stated that Investigator Riddle interviewed Ms. Foster and Ms. Hampton. He said that the Defendant's father brought the Defendant to the police station.

Investigator Wardlaw testified that Ms. Foster was taller than the victim and that the Defendant, who was also taller than the victim, was approximately six feet, three inches tall. Investigator Wardlaw said that the orange car at the scene was located the day after the shooting and that it was registered to Ms. Hampton, who consented to a search. He said that the Defendant stated the handgun used during the shooting had been placed in the glove box of the orange car but that the handgun was never recovered.

Investigator Wardlaw testified that he examined the Defendant's and Ms. Foster's cell phones and that Ms. Foster's phone was used to place two calls to the Defendant's phone on December 11, at 12:25 a.m. Investigator Wardlaw said that Ms. Foster's phone received an incoming call from the Defendant's phone at 12:27 a.m. Investigator Wardlaw said that Ms. Foster's phone was used to place three additional calls to the Defendant's phone at 3:59 a.m.

Investigator Wardlaw testified that the Defendant's initial police statement occurred in the evening hours after the shooting. Investigator Wardlaw said the Defendant stated that he had the handgun for about three weeks at the time of the shooting, that he bought the handgun from someone outside BJ's Market, and that he hid the handgun under his bedroom pillow. Investigator Wardlaw said the Defendant stated that Ms. Hampton had allowed the Defendant to drive her orange car at the time of the shooting because it had been the Defendant's nineteenth birthday weekend. Investigator Wardlaw said the Defendant stated that he had the handgun inside the car while it was parked in the backyard before leaving for the Lonsdale area, which Investigator Wardlaw said was a ten- to fifteen-minute drive, and that the victim was not in the Lonsdale area when the Defendant arrived. Investigator Wardlaw said the Defendant stated that he saw Ms. Foster's Explorer and that the Defendant followed her Explorer to the victim's mother's home, a five-minute drive. Investigator Wardlaw said the Defendant stated that he and Ms. Foster did not discuss the events between Ms. Foster and the victim before arriving at Ms. Logan's home but that Ms. Hampton told the Defendant what had occurred.

Investigator Wardlaw testified that during the Defendant's initial police statement, the Defendant said that Ms. Hampton initially told the Defendant, "[G]et over here fast.

-8-

We're fighting," but that after the Defendant arrived at Ms. Logan's home, Ms. Hampton told the Defendant that the victim was only fighting with Ms. Foster. Investigator Wardlaw said the Defendant stated that when he arrived at Ms. Logan's home, he attempted to talk to the victim, that the victim was "blowing him off," which upset him, that the victim spat on him, and that he swung at the victim in response. Investigator Wardlaw said the Defendant admitted that Mr. and Mrs. Logan asked him to leave the property and that Ms. Foster encouraged the Defendant to leave, as well.

Investigator Wardlaw testified that during the Defendant's initial interview, the Defendant stated that he blacked out after the shooting, that he recalled leaving and running, and that he slept outside, although he had been cold. Investigator Wardlaw said the Defendant stated that he lost his two cell phones during the time immediately following the shooting. After reviewing the Defendant's cell phone records for the telephone number provided by the Defendant, Investigator Wardlaw stated that five outbound calls were placed from the phone on December 11. Investigator Wardlaw stated that a call placed at 1:14 a.m. lasted twenty-six seconds, that a 1:15 a.m. call lasted thirty-one seconds, that a 1:24 a.m. call lasted eighteen seconds, that a 1:37 a.m. call lasted sixty-seven seconds, and that a 1:43 a.m. call lasted eleven seconds.

Investigator Wardlaw testified that the Defendant stated he parked the orange car near the city bus terminal but that the car was not there. Investigator Wardlaw said that the car was found "on the opposite end" near the Knoxville Zoo. Investigator Wardlaw said that during the Defendant's second police interview, he asked the Defendant about the car's location and the absence of the handgun inside the car. Investigator Wardlaw said the Defendant stated that he did not know the reason the car was at a different location and that the handgun had been disposed of near the zoo.

A portion of the video recording of the Defendant's initial statement was received as an exhibit and played for the jury. In the recording, the Defendant stated that Ms. Hampton allowed him to drive her orange car for his birthday. He said that around 12:30 a.m., he received back-to-back telephone calls from his mother's cell phone, that he missed the first call, that he answered the second call, and that he spoke to Ms. Hampton, not his mother. He said that Ms. Hampton stated, "Come out here quick. Me and your momma just got into a brawl with True in Lonsdale."[3] The Defendant stated that he told Ms. Hampton he was on his way. He said that although Ms. Hampton did not request help, he knew she and Ms. Foster needed help based upon what he heard in the background during the call. He described a violent relationship between his mother and her former husband and said that the violence "messed" with him and that he needed help. He said that he drove to Lonsdale and saw glass and his mother's hair lying on the street. He said that he saw his mother's Explorer leaving Lonsdale and thought she was driving home, that he followed her to ensure she was okay, that she drove to Ms. Logan's home, and that he

---

[3] Other evidence showed that the victim was also known as True.

parked the orange car to the side of the Explorer. The Defendant admitted that he had a handgun inside the car but said that the handgun remained in the car, that he got out of the car, and that he had "no intentions of killing anybody" or "pulling a gun."

In the recording, the Defendant stated that his mother got out of her Explorer, leaving the driver's side door open, that she walked to the front door of the home, that she knocked twice but returned to her Explorer when nobody answered, and that the victim opened the front door as she reached the hood. The Defendant said that he stood at the door of the orange car during this time. The Defendant stated that the victim was "talking crazy," calling Ms. Foster a "b----," among other things, and threatening to "kill you." The Defendant stated that he attempted to overlook the victim's statements about Ms. Foster and did not allow the victim's statements to anger him further. The Defendant stated that this incident was the third violent incident between his mother and the victim. The Defendant said that based upon the manner in which the victim swung open the screen door, the Defendant knew the victim was angry and thought the victim was "on some crazy stuff." The Defendant thought the victim had broken the screen door. The Defendant said that he walked toward the victim and asked if the victim had "put his hands" on Ms. Foster after the victim had previously promised he would not abuse her. The Defendant said that the victim responded, "I don't know what you're talking about," and told the Defendant to "get the f--- out of [the victim's] face before [the victim does] this and that." The Defendant said that he attempted to pull the victim aside because Ms. Foster and Ms. Hampton stood beside the Defendant and the victim argued with Ms. Foster as the Defendant attempted to talk to the victim.

In the recording, the Defendant stated that he pulled the victim aside slightly further, that he attempted to talk to the victim one-on-one, that the victim did not want to listen to him, and that the victim spat on his face. The Defendant said that nobody had ever spat on him previously, that he became angry and wanted to fight "for [his] mother," and that "it just went from there." The Defendant said that he swung at the victim and that they "scuffl[ed] on the ground." The Defendant showed the investigator his injuries, photographs of which were received as exhibits. The photographs showed abrasions and scratches on the Defendant's left forearm, left leg, and right leg.

In the recording, the Defendant stated that Ms. Foster positioned herself between the Defendant and the victim, that the Defendant felt as though Ms. Foster chose the victim over the Defendant, and that he only wanted to talk to the victim. The Defendant said that before he drove to Lonsdale, he spoke to his mother on the phone and asked for the victim's cell phone number. The Defendant said that Ms. Foster declined to provide the number and told him "this was [her] fight." The Defendant stated that after his mother broke up the scuffle, Ms. Foster "dragged" him back to the orange car and that Ms. Hampton attempted to calm the victim. The Defendant said that he willingly returned to and got inside the orange car, that he closed the driver's door, and that Ms. Foster walked toward her Explorer. The Defendant said that he thought the incident had ended and that he told

-10-

Ms. Foster multiple times to leave. The Defendant said while he sat inside the orange car, the victim punched Ms. Hampton, that the victim charged at and punched Ms. Foster, and that the victim spat on the Defendant. The Defendant said the victim spat on him a total of three times.

In the recording, the Defendant stated that he did not intend to shoot the victim and that he only wanted to "let off a warning shot." He said that the victim charged at him and that the shooting occurred. The Defendant said that the handgun had been in the orange car and that he tried to fire it in the air from inside the orange car. He denied that he left the orange car after Ms. Foster broke up the scuffle and he got inside the car. He said that the victim stood between the orange car and the Explorer when the shooting occurred.

In the recording, the Defendant stated that the handgun was in the glove box until the victim punched Ms. Hampton and charged at Ms. Foster because the Defendant knew the victim's intentions. The Defendant said that he held the nine-millimeter handgun he purchased at BJ's Market at an angle and that he remembered firing it once. He said that he left the handgun inside the orange car, and when asked about the car's location, he said he only remembered getting out of the car and running. When asked if he called Ms. Hampton to tell her the car's location, the Defendant said nobody answered. The Defendant said he drove toward east Knoxville after leaving the scene and provided the investigator with an approximate location of the car near a bus station. The Defendant said that he left the handgun in the glove box, that he ran, and that he slept on the sidewalk near his home because he was scared.

In the recording, the Defendant stated that he lost his two cell phones, only one of which was operational, when he ran after parking the orange car. He said that he already possessed the handgun when he received the initial telephone call from Ms. Hampton. He said that he only intended to fight the victim. When asked if he and the victim had fought previously, the Defendant said that they "got in a scuffle," which he explained was an exchange of words, but that Ms. Foster made the victim leave before the incident escalated into a physical altercation. The Defendant said that the previous incident involved a physical altercation between the victim and Ms. Foster, in which her hair had been pulled out of her head, and that he confronted Ms. Foster and the victim. The Defendant said that Ms. Foster and the victim denied fighting, that the Defendant asked to see her hair, that she refused to remove her scarf, and that the Defendant knew she and the victim lied.

In the recording, the Defendant stated that the victim wore a shirt and a jacket when the victim left the home and that the victim removed this shirt and jacket before his and the victim's "scuffle." The Defendant said that the victim spat on the Defendant before the victim removed his clothes and agreed that the victim "square[d] up like he want[ed] to fight." The Defendant said that punches were thrown but that the altercation was mostly "tussling on the ground." The Defendant said that Ms. Logan and a man came outside because everyone had been screaming and yelling and that Ms. Logan threatened to call

-11-

the police. The Defendant denied that Ms. Logan and the man attempted to get involved and said that they simply threatened to call the police. The Defendant said that when the couple threatened to call the police, the Defendant said the incident was over and told Ms. Foster to get in her Explorer and to leave. The Defendant said that he had never seen the victim this angry previously and that they had not had any significant issues previously.

In the recording, the Defendant stated that when he arrived at Lonsdale, he saw Ms. Foster and Ms. Hampton outside, the condition of the Explorer's windshield, and glass and his mother's hair on the ground. He said that the women were getting into the Explorer when he arrived and that he did not speak to them before leaving Lonsdale. He clarified that he rolled down the car's window and asked his mother what had occurred but that she did not respond and drove away. The Defendant said that he had never been to Ms. Logan's home and did not know where the victim lived before the shooting.

In the recording, the Defendant stated that after the victim punched Ms. Hampton and charged at Ms. Foster, the victim punched Ms. Foster. The Defendant recalled that Ms. Foster and the victim were at the rear of the Explorer. The Defendant said that the victim spat on the Defendant, that the Defendant retrieved the handgun while the victim continued to spit, and that the Defendant did not immediately fire the gun. The Defendant said he waited, but the investigator did not ask why the Defendant hesitated. The Defendant admitted shooting the victim but did not recall how many times. The Defendant said that he blacked out after the shooting, that he did not recall hearing screaming or seeing the victim fall on the ground, and that the first thing he recalled was running. He said that as he drove back to east Knoxville, he attempted to call his father and mother but that neither answered.

In the recording, the Defendant stated that he parked the orange car between the zoo and a park near small homes and an alley. He stated that the keys might have been in a backpack, which he might have left inside the car. The investigator told the Defendant that his parents were at the police station, that the investigator was going to allow the parents to speak with the Defendant, and that the investigator would ask Ms. Foster to leave if she became "amped up." The investigator left the room.

Investigator Wardlaw testified that the Defendant's statement during the interview that he attempted to call Ms. Foster and Ms. Hampton was inconsistent with the telephone records and with the Defendant's second interview. Investigator Wardlaw likewise said that the Defendant's statement that the handgun remained in the orange car's glove box when he arrived at the scene of the shooting was inconsistent with the Defendant's second interview. Investigator Wardlaw said the orange car was not found in an alley. He said his referring to the Defendant's mother's becoming "amped up" was in connection with her becoming "illustrated" while speaking.

A second portion of the Defendant's initial interview was played for the jury. When asked why he referred to the victim as True, the Defendant stated that the victim was introduced by the name True and that the Defendant did not learn the victim's legal name until later. When asked if he knew anything about the victim, the Defendant said he knew the Defendant was in the Crips gang "107 Underground," based upon how the victim acted and talked. The Defendant said that he had seen the victim "throw" gang signs but that he had never seen the victim "do any dirt." When asked if he heard about the victim's being in jail at any time, the Defendant said Ms. Foster told him that the victim was on parole. When asked if anyone had threatened him since the shooting, the Defendant said that he had received death threats on Facebook and that people told him he should have left town, was not safe anymore, and was going to be killed. The Defendant named three people who had made the threats. When asked if he were worried about "it," the Defendant said he was worried about his mother. The Defendant said that his cousins, who were members of the Crips, told him that "the 107s" were "on my head." The Defendant thought the victim might have been an "OG" or a "big homie." When asked if he thought about the victim's gang affiliation at the time the shooting, the Defendant shook his head left and right to indicate no. He said that when he grabbed the handgun, he felt as though his life were in danger because the victim was not going to stop, because he thought the victim would beat "them" or would grab the handgun and kill "us," and because the victim had threatened to kill "us" previously. The Defendant said that the victim saw the handgun but that the victim "kept on," cursed more, and threatened to kill him, his mother, and Ms. Hampton. The Defendant asked the investigator to give the victim's family his condolences.

Investigator Wardlaw testified that "dirt" referred to committing a crime. He said that he conducted a second interview. A video recording of the second interview was received as an exhibit and played for the jury.

In the recording, the investigator stated that he wanted to speak to the Defendant in order to "clear some things up" because the orange car was found near the zoo, not the park. The Defendant thought he had left the car near the park. The Defendant insisted he left the handgun inside the car. He said he did not take the handgun out of the car and did not ask anyone to remove it from the car. He said that his girlfriend and father picked him up at a convenience store in order to drive him to the police station. The Defendant said he called his father from the store's telephone.

In the recording, the investigator reiterated that the handgun and a backpack were not inside the orange car, and the Defendant said the car was the last place he saw those items. Later, the Defendant said he discarded the handgun near the zoo. The Defendant stated that people wanted to kill him and that he requested protective custody at the jail.

In the recording, the Defendant stated that when he "got the call" before the shooting, he and his girlfriend were sitting inside the orange car, which was parked outside

his home.  He said that the handgun was inside the car's glove box at this time.  He said that his girlfriend left and that he drove the orange car to Lonsdale.

In the recording, the Defendant stated that he had saved his mother from beatings in her previous relationships and that he had been punched by one of her former boyfriends after he intervened.

In the recording, the Defendant said that during the drive to the scene, he thought about previous incidents of violence involving his mother and her boyfriends and that he needed to protect his mother.  He denied taking the handgun out of the car when he arrived at the scene of the shooting.  He said he took the handgun out of the glove box and placed it between the seat and the console because he felt threatened and because he thought his mother's life was in danger based upon his conversation with Ms. Hampton.

In the recording, the Defendant stated he did not call his mother after he spoke to Ms. Hampton.  He said that he received two phone calls, that he spoke to Ms. Hampton during the second call, and that he drove to Lonsdale, where he saw his mother and Ms. Hampton.  The investigator asked when the Defendant grabbed the handgun after returning to the orange car, and the Defendant said the point at which the victim punched Ms. Hampton and charged at and punched Ms. Foster.  The Defendant said that Ms. Logan came outside and returned to the home before he and the victim tussled.  The Defendant said that Ms. Logan and a man called the victim's name, attempted to calm the victim, and attempted to make the victim return to the home.  The Defendant said that Ms. Logan and the man returned to the home and closed the door and that Ms. Logan stated she was going to call the police.  When asked about a witness statement that the Defendant fired the handgun more than once, the Defendant said he must have blacked out.  He said he had blacked out during a domestic incident involving his mother and a previous boyfriend.

Investigator Wardlaw identified Ms. Foster's and the Defendant's cell phone records and testified that the records showed that Ms. Foster's phone was used to place a call to the Defendant's phone at 12:24 a.m., which lasted thirty seconds, and 12:25 a.m., which lasted two seconds.  The records showed that the Defendant's phone was used to place calls to Ms. Foster's phone at 12:27 a.m., which lasted four seconds, and 12:40 a.m., which lasted nine seconds.  The records showed that after the 1:00 a.m. 9-1-1 call, Ms. Foster's phone was used to place a call to the Defendant's phone at 3:59 a.m., which lasted five seconds, and that a subsequent call was placed almost immediately, which lasted two seconds.  The Defendant's phone was used to place calls at 1:14 a.m., which lasted twenty-six seconds, and at 1:15 a.m., which lasted eighteen seconds.  The Defendant's phone placed additional calls at 1:24 a.m., which lasted eighteen seconds, 1:37 a.m., which lasted sixty-seven seconds, and 1:43 a.m., which lasted eleven seconds.

Investigator Wardlaw testified that the Defendant never said the victim knocked the Defendant to the ground and struck the Defendant again as the Defendant stood. Investigator Wardlaw said that the Defendant did not report the inability to stand.

On cross-examination, Investigator Wardlaw testified that the Defendant initially came to the police station on the day of the shooting and admitted shooting the victim before Investigator Wardlaw looked for the orange car and handgun. He said that at the time of the Defendant's first interview, he did not know that Ms. Logan had called the police because the victim was "real angry" and that the victim pulled away from Ms. Logan before she called the police. Investigator Wardlaw agreed that although the victim was "small," size was not equivalent to danger. When asked what factors might determine whether a person is dangerous, Investigator Wardlaw said age and experience. He said that the Crips was a criminal gang organization, that the gang was in Knoxville, and that individual subgroups of the gang existed. He said that he was familiar with the 107 Underground Crips, that 107 UGC was a marker for the gang, and that UGC meant Underground Crips. He said gang markers were used to identify a gang member with the proper subgroup. He agreed, based upon the conclusions of "gang experts," that an advantage of being a gang member was controlling territory through intimidation and violence. He agreed that the victim's clothes and tattoos were a form of "representing" a gang and that someone familiar with gangs would have known the victim was a member of the 107 Underground Crips.

On redirect examination, Investigator Wardlaw testified that he had never heard of the victim before the shooting. Investigator Wardlaw said that Ms. Foster was known as "a little violent" and that the Defendant had "associated" with gang members. On further cross-examination, Investigator Wardlaw stated that the Defendant had been around gang members as a product of his mother's association with gang members. Investigator Wardlaw agreed that the at the time the Defendant was seen with gang members, the Defendant had been a child and had been with his mother.

Knoxville Police Officer Timothy Riddle testified that on October 25, 2016, he responded to a fight involving Ms. Foster and Ms. Foster's neighbor. Officer Riddle said that the altercation involved "cutting," that both women sustained injuries, that he saw a pile of Ms. Foster's hair at the scene, and that the Defendant, who was a minor at the time, and the neighbor had been in a relationship. Officer Riddle said that the case was closed because he could not determine the identity of the primary aggressor and concluded the incident was "mutual combat."

Officer Riddle testified that he interviewed Ms. Foster and Ms. Hampton at the scene. He did not recall Ms. Hampton's having any visible injuries and said Ms. Foster stated that her hair had been "pulled out." Officer Riddle said that he saw a "kind of a balding area in the front of her head" but that he did not notice any additional injuries.

-15-

On cross-examination, Officer Riddle testified relative to the October 2016 incident that Ms. Foster reported being assaulted with a knife and that the neighbor reported being assaulted with a ceramic pumpkin. After reviewing the incident report, Officer Riddle said that Ms. Foster had a "severe laceration." He agreed that he did not know if the hair at the scene belonged to Ms. Foster but that he assumed the hair belonged to her.

Dr. William Oliver, an expert in anatomic, clinical, and forensic pathology, testified that the victim sustained two gunshot wounds to the chest. The victim weighed 137 pounds and was sixty-seven inches tall, and his hands were "bloodstained." Dr. Oliver determined that the handgun was fired one and one-half or two feet from the victim. He said that one of the wounds did not have soot, stippling, and searing but that the other wound showed searing "from the flame, from the fire" of the handgun. He said that the victim had abrasions and scratches on the forehead, knees, right wrist, and right finger.

On cross-examination, Dr. Oliver testified that the victim's blood alcohol concentration was .227% and that most people would be "recognizably impaired" at this level. He said that the injuries to the victim's head were consistent with blood loss, not trauma.

Dr. Oliver testified that the Defendant could have been "leaning into a car window." He stated that the Defendant's sitting inside a car and the handgun's being two feet from the victim was consistent with his conclusions.

Delise Foster testified for the defense that she left home at age fifteen because of the abuse she suffered at home. She said that she was age twenty-one when the Defendant was born and that she, her older daughter, the Defendant, and the Defendant's father lived together until the Defendant was age four. Ms. Foster said that she married Marquise Thomas when the Defendant was age eight. She described a verbally and physically abusive marriage and said that she hid her injuries but that she could "only hide so much." She said that a person became accustomed to abuse when it occurred for a long time and that it became "natural to hide." She said that Mr. Thomas went to prison when the Defendant was age sixteen or seventeen.

Ms. Foster testified that after Mr. Thomas went to prison, life returned to normal and that she met the victim one year later. She said that initially, the victim was a "decent guy." She said that the Defendant, who was age sixteen, expressed concern about her relationship with the victim and asked the victim to not "put [his] hands" on Ms. Foster. She said that eventually the victim became physically and verbally abusive. She said that she tried to hide the abuse and that she never told the police because it "became second nature" not to tell anyone.

Ms. Foster testified that on December 11, 2016, she, Ms. Hampton, and the victim went Christmas shopping and that the day "started off good." She said that the victim and

Ms. Hampton drank three pints of vodka during the day and that after the second bottle, she questioned the victim about whether the alcohol would "cause any problems." She said that although the victim reported everything was fine, she knew the victim became violent when he drank. She said that after they dropped off Christmas presents at Ms. Logan's home and her mother's home, she drove to Lonsdale because Ms. Hampton wanted to visit her cousins. Ms. Foster said that Ms. Hampton's cousins got inside the Explorer, that they went to the store to purchase Heineken, that the victim and Ms. Hampton's cousin drank Heineken, that they returned to Lonsdale, that Ms. Foster and Ms. Hampton's cousin "got into a verbal altercation," and that the victim became upset. Ms. Foster said that she sat in the front passenger seat, that the victim drove, and that Ms. Hampton sat in the back. Ms. Foster said that while she was buckled in the front passenger seat, the victim grabbed her hair, wrapped his hand around her hair, and struck her face. She said she heard her hair ripping from the scalp. She said that the victim pulled her body to the console, that Ms. Hampton attempted to help, that Ms. Foster "blacked out," and that she awoke to Ms. Hampton's waking her. Ms. Foster identified a photograph of her head, which depicted spots where she was missing hair, and said that the hair the victim pulled out was inside her Explorer. She said that the forceful removal of her hair did not occur during the October 25, 2016 incident, that a neighbor stabbed her, and that she pushed the neighbor.

Ms. Foster testified that after Ms. Hampton woke her, she saw the passenger-side portion of the windshield of her Explorer had been broken. She said that she became upset and drove to Ms. Logan's home to confront the victim. She did not know why she did not call the police.

Ms. Foster testified that when she arrived at Ms. Logan's home, she knocked on the door, that the victim came outside, and that she told the victim to look at what he had done to her hair and to her Explorer. She said that they argued, that the Defendant arrived, and that she did not know how the Defendant knew she was there. Ms. Foster said Ms. Hampton stated that Ms. Hampton had called the Defendant. Ms. Foster said that initially, the Defendant and the victim talked but that they began to fight, and that she and Ms. Hampton separated the Defendant and the victim. Ms. Foster said that Ms. Logan looked out of the front door, that the victim "got away," and that the victim and the Defendant resumed fighting. She said that the victim broke away a second time, that she asked Ms. Logan to help her get the victim, and that the Defendant was "getting back into" the vehicle to leave. Ms. Foster said that the victim broke away a third time and told the Defendant, "You a b---- and your mother's a b----." Ms. Foster said that although the Defendant was getting inside the car to leave, she continued to ask for help. She said that the victim punched Ms. Hampton, that Ms. Hampton fell, that the victim broke away and removed his shirt, and that "they" fought. Ms. Foster said that "we" were able to separate the Defendant and the victim, that the Defendant got inside the car, and that the victim spat at the Defendant as the Defendant backed away from the victim. She said that the victim spat at the Defendant again and "that last time is the shot."

-17-

Ms. Foster testified that the victim was "[n]ot very far" from the orange car at the time of the shooting. She said that she began CPR and that she told the Defendant to leave because she knew "gang members were coming" because "[t]hat's how it works." She said that as she performed CPR, the police arrived, that an officer told her to "get up now," and that she was placed in a police car. She said she and Ms. Hampton went to the police station.

On cross-examination, Ms. Foster testified that the victim was calm and quiet when he left the home. She did not recall telling the police that she went to Ms. Logan's home to obtain her cell phone and said she went there to confront the victim about his abuse and vandalism. She agreed that she did not mention during her police interview that the victim and the Defendant fought before the shooting. She said that she had been hysterical at the time of the interview, that she had not been thinking clearly, and that she had attempted to tell the police what occurred. She said that she did not see the handgun before the shooting and that she told the police she directed the Defendant to leave.

Ms. Foster testified that she did not see the Defendant's arm extended out of the car window and that the window was "cracked enough for the gun to . . . [be pointed] out the window." She said that the Defendant was inside the car when it was fired. She said that the Defendant was tall and slim but did not weigh ten to fifteen pounds more than the victim.

Ms. Foster testified that she told the police that the victim punched Ms. Hampton in the jaw and that the victim pushed Ms. Foster in the chest area as Ms. Foster held the victim. Ms. Foster said that she and Ms. Hampton were near the Explorer at this time. Ms. Foster said that the Defendant and the victim fought twice and that she did not recall "anyone getting the better of anyone" during the fights. She said the Defendant "hit the ground" during the fights. She did not recall testifying at the preliminary hearing that the Defendant "was handling himself in the fight."

Ms. Foster testified that the fight between her and the victim had ended when the victim left the Lonsdale area. When asked if she called the Defendant at 12:24 and 12:25 a.m. before the shooting, she said that she never called the Defendant and that Ms. Hampton used Ms. Foster's cell phone to call the Defendant. Ms. Foster agreed that her phone received a call from the Defendant's phone at 12:27 a.m. and that she did not answer the call because she did not have her phone. She said that her phone received a call from the Defendant's phone at 12:40 a.m. but that she did not know about this call at the time.

Ms. Foster testified that she remained in the Lonsdale area for about five minutes before leaving, that the drive to Ms. Logan's home was about eight minutes, and that the Defendant arrived at the home about six minutes after her arrival. She said that she did not speak to the Defendant at Lonsdale.

Ms. Foster identified the location of the four vehicles at the scene of the shooting. She said the victim fell backward after he was shot. She said that at the time of the shooting, the victim stood between her Explorer and the orange car, in which the Defendant sat. She said that she told her son to leave and that the victim did not tell the Defendant to leave. She said that Ms. Logan never came outside until the police arrived and did not tell the Defendant to leave. Ms. Foster said that she asked Ms. Logan for help with the victim. She did not recall the Defendant's stating, "If he's not trying to fight, then let's go," to her.

Ms. Foster testified that she did not know the Defendant had purchased a handgun and that she did not know he had a handgun inside the car. She said, though, she was not surprised that the Defendant had a handgun generally because of "the neighborhood, the drive-bys." She said they "had to hit the ground so many times." She said that the Defendant was not a violent and angry person and that the Defendant had a reputation for being peaceful.

On redirect examination, Ms. Foster testified that she felt as though nobody was listening to her at the scene of the shooting. She agreed that when the victim "gets like that, can't nobody stop him." When asked if the victim was a good fighter, she said that he "could fight." She said that when she told the victim that she was going to "f--- . . . up" the victim and call his parole officer on Monday, she meant that calling his parole officer would be "getting f----- up." She said that she was distraught during her police interview because the victim had assaulted her, she had witnessed her son kill the victim, and her efforts to save the victim had been unsuccessful.

On further cross-examination, Ms. Foster testified that she did not recall getting out of her Explorer after Ms. Hampton woke her. She said that she sat in the driver's seat and that Ms. Hampton walked around the Explorer to show her the broken windshield. She agreed she stated at the preliminary hearing that she left the vehicle.

The twenty-one-year-old Defendant testified that he was age eighteen at the time of the shooting, which occurred two days before his nineteenth birthday. He described his childhood with his mother as alternating periods of tranquility and violence. He said that when his mother was not involved in a romantic relationship, his home life was peaceful and family orientated but that the environment became violent when his mother became involved with men. He said that at age ten he was cognizant of the violence and that he saw his mother with black eyes and swollen lips. He said he felt "hopeless" because he knew he was too young to "protect her from that kind of violence." He said he could not control "it." He said that talking to his mother did not help because she denied the abuse and told him to "stay in a child's place." He said that afterward, he could only "sit and watch . . . what was going on."

The Defendant testified that he had recently turned eighteen when he met the victim, that the victim had a "persona" with which he did not want to be involved, and that on the

day he met the victim, he learned the victim was a gang member. The Defendant said that many of his basketball teammates, classmates, and family members became involved in gangs. He said he knew the victim was a gang member. The Defendant said that he became concerned the victim would "beat" his mother, as her former husband had beaten her, because both men were Crips members.

The Defendant testified that on the night of the shooting, he received two calls from his mother's cell phone while he sat inside the orange car, which was parked in the driveway of his home. He said that he was unable to answer the first call because the caller ended the call and that he wondered why his mother was not sending text messages as she usually did. He said that he answered the second call, that Ms. Hampton was on the call, and that he heard his mother screaming and what he thought was an altercation between his mother and the victim. He said that he immediately drove to Lonsdale, that he did not know the exact location, that he saw his mother's Explorer on the other end of the street, that as he approached his mother's Explorer, he saw her and Ms. Hampton inside the Explorer, and that the Explorer began to drive away as he approached in the orange car. He said that after he saw his mother's Explorer drive away, he thought, "Everything's okay. Let's just go home. Everything is fine."

The Defendant testified that he decided to follow his mother home to ensure she was okay but that she drove to the victim's mother's home, with which he was unfamiliar. He said that he parked the car behind and to the right of his mother's Explorer. He said that before he had the opportunity to talk to his mother, she was "already at the door" to the home. He said that while his mother knocked on the door, Ms. Hampton talked to him and that he noticed from a distance his mother's missing hair and knew "she had been beat on." He said he felt as though he was age eleven or twelve again and that it took him "back to those times that I seen it before." He said the handgun was inside the car at this time.

The Defendant testified that he approached his mother and the victim, that he saw the extent of his mother's missing hair, and that he asked the victim if what Ms. Hampton said was true. The Defendant said that the victim responded, "F--- you, f--- your mom and your mother's a b----." The Defendant said that he became a little agitated because the response was unexpected, that the victim gave the Defendant a look as though the victim were questioning how the victim truly felt about him and his mother, and that the victim spat. The Defendant admitted that he became more agitated, wanted to fight the victim, and swung at the victim. The Defendant said, though, that he swung at the victim after he had attempted to pull the victim aside to speak with him because the victim and his mother were arguing.

The Defendant testified that after he swung at the victim, they began to fight and that his mother stepped between them to stop the fight. He said that Ms. Hampton pulled him toward the orange car and that his mother pulled the victim toward the home. He said that as Ms. Hampton pulled him away from the fight, he told her that she did not need to

-20-

pull him and that he was going back to the car. He said that the victim "broke loose" from his mother, that the victim charged toward him in order to fight again, that they fought, and that this second fight ended with the victim's punching him twice. The Defendant said that he was left on the ground and that afterward, he wanted to leave because he did not think he could help the situation, just as when he was younger.

The Defendant testified that after he stood, he returned to the orange car and that the victim "snatche[d] away from basically everybody" as the Defendant opened the car door. The Defendant said that he sensed the victim was coming toward him and that the victim punched his mother and Ms. Hampton in an effort to get away from the women and to get to him. The Defendant said that leaving "wasn't a logical option" because he would have left his mother with a "predator." He said that when he followed his mother, his intent was to ensure she was okay and to "get her home." The Defendant said that when he saw the victim charge at him, he grabbed the handgun. He said that he grabbed the handgun "solely and wholeheartedly because I felt like nobody could stop" the victim. The Defendant said that the victim acted as though he did not just want to fight generally but rather that the victim was "going to do something else, type of punch." The Defendant admitted shooting the victim and said that he was scared for himself, his mother, and Ms. Hampton. He said that he panicked, that he did not recall how many times he fired the handgun, and that he would not dispute testimony reflecting three shots. The Defendant said that firing the handgun was a "reaction," not something he planned. He said he felt shooting the victim was "what he had to do for him to stop. Couldn't nobody else stop him and me fighting him in a way was showing that I wanted it to stop." The Defendant said he first fired a warning shot.

The Defendant testified that when his mother told him to leave because gang members would be arriving, he agreed that it was "best" for him to leave. He said he was scared of the victim's fellow gang members. He said that otherwise, he would have preferred to stay and speak to the police.

On cross-examination, the Defendant described the man from whom he purchased the handgun at BJ's Market approximately three to four weeks before the shooting. The Defendant said that the man asked him if he wanted to purchase a handgun and that he decided to purchase it because his "house had just gotten shot up." He said that he gave the man an estimated sixty dollars, that the man gave him the handgun and left, and that he walked inside the store, made a purchase, and walked home with the handgun. The Defendant said that he did not consider whether it was illegal for him to purchase the handgun and that he simply wanted protection. He said that he placed the handgun under his bedroom pillow because he knew another shooting would occur at his home and that he would have given the handgun to his mother and told her that he had "protection for the house" if another shooting occurred. He denied that he purchased the handgun for protection from the victim and said it was to protect his home from gang-related shootings. He denied that he removed the handgun from the home before December 9, 2016.

-21-

The Defendant testified that Ms. Hampton allowed him to drive her orange car beginning on December 9, 2016, that he placed the handgun inside the glove box because of a shooting that occurred the previous night, and that the handgun stayed in the glove box until the night of the shooting on December 11. He said that he removed the handgun from the glove box before he left home to drive to Lonsdale and that he placed it in the console area. He denied he was angry when he received the phone call from Ms. Hampton and said he was worried. He said that he "called their names," attempting to speak to his mother and Ms. Hampton while he was in the Lonsdale area, but that his mother continued driving away. He said that he looked for his mother when he arrived in the Lonsdale area and that he did not see the victim.

The Defendant testified that he felt threatened as he followed his mother's Explorer to Ms. Logan's home because he knew "it was gang-related area." When asked if he felt threatened by the victim, the Defendant said that he did based upon the victim's Crips gang affiliation. The Defendant agreed that the victim told him to get out of the victim's face. The Defendant clarified that he did not physically pull the victim away when he attempted to talk to the victim and to stop the argument between the victim and Ms. Foster. The Defendant said he and the victim were one and one-half to two feet apart. The Defendant said that after he asked the victim if he had hit his mother, the victim spat on his face and that he swung at the victim but did not strike him. The Defendant said nobody asked him to leave.

The Defendant testified that after he left the scene, he drove to the where the orange car was later found. He said that he took the handgun and his cell phone when he left the car and that the backpack inside the car did not belong to him. He said that he took the keys, that he walked to where he threw the handgun "behind the zoo," and that he ran home but slept outside. He said that he lost his cell phones when he ran home and that after he woke, he spoke to his father on a convenience store telephone. The Defendant said he last used his cell phone after he left the scene.

The Defendant testified that he was inside the orange car with the door closed when he fired the shots and that the window was down partially. He said that he extended his arm to the window, that the victim was "at [the] window," and that he pulled the trigger. The Defendant said that the victim faced him and was within "arm's reach" when he fired the shots. The Defendant said that the car's engine and headlights were off at the time of the shooting.

On rebuttal for the State, Lawanna Foust, the victim's sister, testified that in October 2016, Ms. Foster came to her home, that Ms. Foster's hand and arm were "banged up," and that Ms. Foster reported fighting a neighbor. Ms. Foust said Ms. Foster showed her the "side of her hair where her hair was pulled out."

-22-

Investigator Wardlaw testified that Ms. Foster called the Defendant's cell phone around 3:00 a.m. at his direction during her police interview. He said that he took her phone after her interview. He said that during her interview, Ms. Foster only reported an argument at the scene of the shooting and that she never mentioned two fights, the victim's punching her and Ms. Hampton, and the victim's pushing her. Investigator Wardlaw stated that Ms. Hampton reported no injuries. He said that Ms. Foster's only injuries were associated with her hair. He said that "they all" smelled of alcohol after the shooting.

Upon this evidence, the jury found the Defendant guilty of second degree murder. The trial court imposed a seventeen-year sentence. This appeal followed.

## I.     Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his second degree murder conviction. He argues that the evidence supports his claim of self-defense and, alternatively, that the evidence is insufficient "to reach beyond voluntary manslaughter." The State responds that the evidence is sufficient and that the evidence adequately rebutted the Defendant's claim of self-defense.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). A conviction may be based upon circumstantial evidence alone. *See Dorantes*, 331 S.W.3d at 380-381.

Second degree murder is a knowing killing of another. T.C.A. § 39-13-210(a)(1); *see id.* § 39-11-106(a)(20) (2018). With regard to second degree murder, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b) (2018); *see State v. Page*, 81 S.W.3d 781 at 787. "[T]he 'nature of the conduct' that causes death is inconsequential." *Page* 81 S.W.3d at 787. A knowing

intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93.

> In Tennessee a person acts in self-defense when he or she
>
>> is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if: (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury; (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and (C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(2)(A)-(C) (2018) (subsequently amended). Once a defendant has raised sufficient facts to support a finding he acted in defense of self or another, "The [S]tate has the burden of proof to negate the defense; the burden is not upon the defendant to prove the defense exists." *State v. Belser*, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996) (citing T.C.A. § 39-11-201(a)(3)).

In the light most favorable to the State, the victim arrived at Ms. Logan's home around 1:00 a.m. after a verbal and physical altercation with Ms. Foster, the Defendant's mother. Ms. Foster drove to Ms. Logan's home, knocked on the door, and the victim came out of the home. The victim and Ms. Foster argued outside the home. At some point, the Defendant arrived. Ms. Logan saw the Defendant, the victim, and Ms. Foster arguing outside. Ms. Logan left the home, saw the Defendant holding a handgun, instructed everyone to leave, and threatened to call the police. Ms. Logan saw the Defendant holding the handgun during the verbal altercation before the Defendant returned to the orange car. Although Ms. Logan was able to pull the victim, who was angry, to the front porch and the Defendant returned to the orange car, the verbal argument persisted, and the victim broke away from Ms. Logan, removed his shirt, and shouted profanities. Ms. Logan said that the altercation was verbal and that the victim did not come into physical contact with anyone. Ms. Logan went inside to call the police because once the victim became angry, "nobody could stop" the victim. Ms. Logan heard three gunshots when she was inside. The Defendant did not deny shooting the victim, and although he only recalled firing the handgun once, he did not dispute firing it multiple times. As a result, the jury could have concluded beyond a reasonable doubt that the Defendant's shooting the victim was reasonably certain to cause the victim's death.

In reaching this conclusion, we have not overlooked the Defendant's claims of self-defense and of defense of his mother. The State's evidence showed that Mr. and Mrs. Logan each testified that the Defendant held a handgun while standing outside the home. They likewise testified that the altercation among the Defendant, Ms. Foster, and the victim had been verbal and that the victim did not make physical contact with anyone, although

-24-

the victim had been angry. The evidence established that the victim was unarmed and that the Defendant sat inside the orange car when the shooting occurred. In contrast, the Defendant and Ms. Foster testified that the victim was violent and angry and that the victim assaulted Ms. Hampton, charged at and assaulted Ms. Foster, and charged at the Defendant, who sat inside the orange car, at the time of the shooting. The Defendant fairly raised claims of defense of self and of his mother. However, the Defendant gave inconsistent statements to the police, and Ms. Foster did not tell the police that the Defendant and the victim were involved in any physical altercations before the shooting. Ms. Foster likewise did not tell the police that the victim assaulted her and Ms. Hampton before charging at the Defendant, who sat inside the car. Investigator Wardlaw testified on rebuttal that Ms. Hampton did not report having any injuries and that Ms. Foster's only injuries were associated with her hair being pulled out. Therefore, the jury could have discredited the defense evidence that any physical altercations occurred at the time of the shooting and determined that any fear of imminent danger of death or serious bodily injury to the Defendant and his mother was unreasonable.

Furthermore, as we discuss in detail below, the Defendant had a duty to retreat before engaging in self-defense, and a proper instruction on the duty to retreat was provided to the jury. *See State v. Perrier*, 536 S.W.3d 388 (Tenn. 2017). Although the evidence reflects that the Defendant returned to the orange car, he did not leave. Rather, he testified that he sat inside the car with the engine and headlights off and that he shot the victim twice from inside the car. As a result, the jury could have determined that the Defendant failed to retreat before engaging in self-defense. The State sufficiently negated the Defendant's assertions of self-defense and defense of his mother, and the evidence is sufficient to support his second degree murder conviction. The Defendant is not entitled to relief on this basis.

## II.     Self-Defense Jury Instruction

The Defendant contends that the trial court erred by instructing the jury that the Defendant had a duty to retreat before using deadly force during the exercise of self-defense. He argues that no nexus existed between the unlawful possession of a handgun based upon his lack of a handgun carry permit and the victim's killing and that, as a result, the trial court should not have instructed that the Defendant had the duty to retreat before engaging in self-defense.

A criminal defendant has "a right to a correct and complete charge of the law." *Hanson*, 279 S.W.3d at 280 (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000)). As a result, a trial court has a duty "to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citing *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011)); *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). A jury instruction related to general defenses is not required to be submitted to the jury "unless it

is fairly raised by the proof." T.C.A. § 39-11-203(c) (2018). An erroneous jury instruction, though, may deprive the defendant of the constitutional right to a jury trial. *See Garrison*, 40 S.W.3d at 433-34.

Our supreme court has concluded that sufficient evidence to fairly raise a general defense "is less than that required to establish a proposition by a preponderance of the evidence." *Hawkins*, 406 S.W.3d at 129. A trial court's determination in this regard "must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor." *Id.*; *see State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001); *Johnson v. State*, 531 S.W.2d 558, 559 (Tenn. 1975); *State v. Bult*, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998); *see also State v. Shropshire*, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993). If evidence has been presented which reasonable minds could accept as a defense, "the accused is entitled to appropriate instructions." *Johnson*, 531 S.W.2d at 559.

When the evidence presented at the trial fairly raises a general defense, the trial court is required to provide the jury with the appropriate instruction. *Hawkins*, 406 S.W.3d at 129. A jury instruction, though, is "prejudicially erroneous only if the . . . charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005).

In Tennessee a person acts in self-defense when he or she,

> is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if: (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury; (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and (C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(2)(A)-(C). Furthermore, the pattern jury instruction for self-defense provides, in relevant part, the following:

> Included in the defendant's plea of not guilty is *[his][her]* plea of self-defense.

> If a defendant was in a place where he or she had a right to be, he or she would have a right to *[threaten][use]* force against the *[deceased][alleged victim]* when and to the degree the defendant reasonably believed the force was immediately necessary to protect against the alleged

-26-

victim's *[use][attempted use]* of unlawful force. **[Remove this bracketed language if the trial court finds the defendant was engaged in unlawful activity after a hearing. See Comment Two**: The defendant would also have no duty to retreat before *[threatening][using]* force.**]**

[If a defendant was in a place where he or she had a right to be, he or she would also have a right to *[threaten][use]* force intended or likely to cause *[death][serious bodily injury]* if the defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real, or honestly believed to be real at the time, and the belief of danger was founded upon reasonable grounds. **[Remove this bracketed language if the trial court finds the defendant was engaged in unlawful activity after a hearing. See Comment Two**: The defendant would also have no duty to retreat before *[threatening][using]* force likely to cause *[death][serious bodily injury]***].**]

T.P.I–Crim. 40.06(b) Defense: Self-defense (23rd ed. 2019) (emphasis in original) (footnotes omitted).

Before closing arguments, the parties discussed the contents of the self-defense jury instruction. Trial counsel argued that, as a matter of due process, a nexus should exist between any unlawful conduct and the killing. The State argued that in addition to the Defendant's unlawful possession of the handgun based upon the Defendant's not having obtained a handgun carry permit, the Defendant trespassed at the time of the killing based upon testimony that the Defendant was told to leave. The State, likewise, argued that the Defendant possessed the handgun with the intent to go armed. As a result, the State requested an instruction that the Defendant had a duty to retreat before engaging in self-defense.

In the context of self-defense, our supreme court has concluded that when a defendant is engaged in unlawful activity, he or she has a duty to retreat before exercising lethal force. *Perrier*, 536 S.W.3d at 398-399. The trial court determined that the Defendant had a duty to retreat before engaging in self-defense. The court stated that the duty to retreat only applied when a defendant was engaged in unlawful conduct. The court found that no evidence showed that the Defendant had a handgun carry permit and that as a result, the Defendant was engaged in unlawful conduct. The court determined that although the Defendant was entitled to receive a self-defense instruction, it would be "more limited." When asked if the court was finding that the Defendant trespassed and possessed the handgun with the intent to go armed, the court stated it "was not making those findings but . . . was giving the instruction based on the fact that he was engaged in unlawful conduct." After the trial, the court determined for the first time at the motion for a new trial hearing

that the unlawful handgun possession "led . . . right directly to the killing," finding a nexus between the unlawful activity and the killing.

The record reflects that the trial court instructed the jury, in relevant part, as follows:

Included in the defendant's plea of not guilty is his plea of self-defense.

The defendant would have a right to use force against the deceased when and to the degree the defendant reasonably believed the force was immediately necessary to protect against the alleged victim's use or attempted use of unlawful force.

The defendant would also have a right to use force intended or likely to cause death or serious bodily injury if the defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real or honestly believed to be real at the time, and the belief of danger was founded upon reasonable grounds.

The defendant had a duty to retreat before using force against the deceased. The law of self-defense requires that the defendant must have employed all means reasonably in his power, consistent with his own safety, to avoid danger and avert the necessity of taking another's life. This requirement includes the duty to retreat, if, and to the extent, that it can be done in safety.

In determining whether the defendant's use of force in defending himself was reasonable, you may consider not only his use of force but also all the facts and circumstances surrounding and leading up to it. Factors to consider in deciding whether there were reasonable grounds for the defendant to fear death or serious bodily injury from the deceased made known to the defendant the character of the deceased for violence, when known to the defendant; the animosity of the deceased for the defendant, as revealed to the defendant by previous acts and words of the deceased; and the manner in which the parties were armed and their relative strengths and sizes.

As a result, the record reflects that the trial court instructed the jury that the Defendant had a duty to retreat before engaging in self-defense, based solely upon the Defendant's possessing a handgun without having obtained a handgun carry permit. *See* T.C.A. § 39-17-1351.

In *Perrier*, the defendant became engaged in a verbal altercation with two men outside a convenience store. The verbal exchange culminated in the defendant's removing a handgun from his jacket and firing at the men. The defendant, who had a previous felony conviction, asserted self-defense. *Perrier*, 536 S.W.3d at 393. Our supreme court determined that possession of a handgun by a convicted felon was unlawful activity as contemplated by the self-defense statute. *Id*. at 404. Although the defendant asserted that any unlawful activity must have a "causal nexus" to the perceived need to defend oneself, the supreme court declined to resolve the issue. The court stated that, based upon the facts in this case, resolving the nexus question was unnecessary because "no reasonable jury would have accepted the defendant's self-defense theory." *Id*. at 404-05. The court stated that any belief that the defendant was in imminent danger of death or serious bodily injury was unreasonable because the altercation was verbal and because the men had not attempted or used unlawful force against the defendant. *Id*. at 405.

In *State v. Tyshon Booker*, No. E2018-01439-CCA-R3-CD, 2020 WL 1697367, at *1-14 (Tenn. Crim. App. Apr. 8, 2020), *perm. app. granted* (June 8, 2020) (order) (granting application for permission to appeal on the sole issue of whether sentencing a juvenile to life imprisonment is unconstitutional), the defendant shot and killed the victim during a "botched robbery." The defendant, a juvenile, admitted shooting the victim multiple times in the back as the defendant sat in the rear passenger seat of the victim's car because he feared the victim was going to shoot him and the codefendant. The trial court determined that the defendant had been a juvenile in possession of a handgun and that as a result, he was engaged in unlawful activity at the time of the shooting. The court instructed the jury that the defendant had a duty to retreat before engaging in self-defense. On appeal, this court determined after considering *Perrier* that "a causal nexus between a defendant's unlawful activity and his or her need to engage in self-defense is necessary before the trial court can instruct a jury that the defendant had a duty to retreat." *Id*. at *27. The court noted the "absurd" results if the self-defense statute were interpreted without a nexus requirement between the unlawful activity and the duty to retreat. *Id*. The court noted, for example, that without a nexus requirement, a defendant who had failed to pay income taxes would be unable to engage in self-defense. *Id*. Although the court conceded that the defendant's "status as a juvenile in possession of a handgun" could have been the "cause of the confrontation," "status offenses such as this will rarely qualify as unlawful activity because a person's status alone cannot provoke, cause, or produce a situation." *Id*. In rejecting the use of the defendant's status as a juvenile in possession of a handgun as the basis for the unlawful activity, the court determined that the evidence overwhelmingly established a causal connection, or nexus, between the defendant's robbing the victim and the defendant's "perceived need to engage in self-defense." *Id.* As a result, the court determined that the defendant was engaged in unlawful activity at the time of the shooting and that he had a duty to retreat before engaging in self-defense. *Id*.

Similarly, in *State v. Yancey Lee Williams III*, No. M2019-00091-CCA-R3-CD, 2020 WL 3435504 (Tenn. Crim. App. July 29, 2020), the defendant and the victim were

involved in an "ongoing dispute" regarding the sale of marijuana occurring shortly before the victim's death. After expressing contempt for receiving less than the agreed upon amount, the victim drove to the defendant's home, and an altercation occurred that resulted in the defendant's shooting the victim. The defendant asserted self-defense. *Id*. at *1-9. The trial court determined that the defendant had been engaged in criminal activity based upon the marijuana dispute. *Id*. at *14. The trial court found, in relevant part, based upon the State's proof that the defendant admitted selling the victim an ounce of marijuana shortly before the shooting, that only one-half ounce was found inside the victim's vehicle, and that the victim sent text messages to the defendant about being "shorted." *Id*. As a result of this evidence, the trial court instructed the jury that the defendant had the duty to retreat before engaging in self-defense. On appeal, this court, utilizing the nexus requirement from *Tyshon Booker*, determined that the trial court properly instructed the jury that the defendant had a duty to retreat. The court concluded that the defendant was engaged in the unlawful activity of selling marijuana and that his use of self-defense was "causally-connected to the ongoing dispute over the exchange of drugs." *Id*. at *15.

Mindful of these principles, we consider whether the Defendant was engaged in unlawful activity at the time of the shooting, requiring him to retreat before engaging in self-defense. As a preliminary matter, the State asserts in its brief that the Defendant was engaged in criminal activity at the time of the shooting because the Defendant was a minor when he purchased the handgun used during the killing. *See* T.C.A. § 39-17-1319(b) (2018) (Unless a statutory exception applies, "it is an offense for a juvenile to knowingly possess a handgun."). The Defendant's date of birth is December 13, 1997, and the shooting occurred on December 11, 2016, when he was age eighteen. The only evidence in the record relative to the purchase date of the handgun was the Defendant's testimony that he purchased it outside a convenience store three to four weeks before the shooting. The State did not present evidence showing that the Defendant was a juvenile during any of the events relevant to this case. *See id*. § 39-17-1319(a)(2) (defining juvenile as any person less than eighteen years old). Any assertion that the Defendant was a juvenile in possession of a handgun is not supported by the record.

Furthermore, the State argues that the Defendant unlawfully possessed the handgun because of his age based upon the Defendant's testimony that he knew he was "not supposed to have" the handgun. However, the record does not contain evidence of any legal basis upon which the Defendant could not lawfully own a handgun. Although at a bench conference the prosecutor and the trial judge appeared to conclude that the Defendant could not purchase the handgun because he did not have a handgun carry permit, possession of a handgun for the purpose of transporting it home is not unlawful. *See* T.C.A. §§ 39-17-1303 (2018), -1306 (2018), -1307 (2018), -1309 (2018), -1311 (2018), -1321 (2018), -1324 (2018). We note that the Defendant's purchasing the handgun outside a convenience store is the equivalent of handgun sale between two private parties outside a gun show venue, which is not inherently unlawful in Tennessee.

-30-

Although the record is void of any evidence showing the Defendant engaged in unlawful activity relative to the purchase, the prosecutor cross-examined the Defendant as follows:

Q       You knew purchasing this gun was something that you -- was illegal for you to do?

A       No, I did not.

Q       You didn't know you couldn't do that?

A       No. I wasn't thinking about whether if it was legal or not. I was just wanting protection.

Trial counsel objected, and a bench conference was held out of the jury's hearing. Counsel requested to know how the Defendant's purchasing the handgun was illegal. The prosecutor said that the Defendant was eighteen, and the court stated, "I think you have to be 21." The prosecutor stated that a person had to be age twenty-one to possess a handgun with a permit. Although a person must generally be age twenty-one in order to obtain a handgun carry permit, nothing in our statutes generally prohibit a person between the ages of eighteen and twenty from purchasing a handgun. *See* T.C.A. § 39-17-1351. The prosecutor's questions implied the Defendant had committed a criminal act when in fact he had not, based upon the evidence in the record. The Defendant stated that he placed the handgun in his pocket, walked home, and placed the handgun inside his bedroom, where it remained until two days before the shooting. Nothing in the Defendant's testimony regarding the purchase and transportation of the handgun implicated criminal conduct due to the Defendant's not having a handgun carry permit. Transporting a handgun home for the purpose of home defense is not the equivalent of unlawful possession of a handgun with the intent to go armed. *See id.* § 39-17-1307(a)(1). The prosecutor misled the jury in this regard, and the trial court failed to instruct the jury accordingly.

Furthermore, the trial court erred by determining that the Defendant's possession of the handgun without a permit to carry was unlawful conduct. Tennessee Code Annotated section 39-17-1307 generally defines the offense of unlawfully carrying or possessing a weapon. The statute prohibits a person from carrying a weapon, including a handgun, with the intent to go armed. *See id*. The statute likewise prohibits "mere possession of a handgun by certain convicted felons" and misdemeanants and "mere possession of a deadly weapon by one who intends to use it to commit an offense." *Id*. § (b)(1), (c)(1), (d)(1), (f)(1), Sent'g. Comm'n. Cmts. However, the statute does not criminalize mere possession of a handgun in the absence of a handgun carry permit. Likewise, additional statutes regulating handguns do not criminalize mere possession in the absence of a handgun carry permit. As a result, the trial court erred by determining that the Defendant's possession of a handgun without having obtained a handgun carry permit was unlawful activity.

-31-

The record reflects, though, that the Defendant was nonetheless engaged in unlawful activity at the time of the shooting. The State sought a finding from the trial court relative to whether the Defendant possessed a handgun with the intent to go armed at the time shooting, and the court declined. When the prosecutor asked the court to clarify if it was finding that the Defendant had possessed the handgun with the intent to go armed, the court responded that it "was not making those findings but . . . was giving the instruction based on the fact that he was engaged in unlawful conduct." The court's response was ambiguous as to whether it had considered and rejected this as a basis for determining the Defendant was engaged in unlawful activity or whether the court was not going to consider it because it had already determined the Defendant's unlawful activity was possession of a handgun without having obtained a handgun carry permit.

In any event, the record supports a determination by clear and convincing evidence that the Defendant possessed the handgun with the intent to go armed. *See Perrier*, 536 S.W.3d at 403 (The State must establish by clear and convincing evidence that a defendant was engaged in unlawful activity in order to instruct on the duty to retreat). The record reflects that three or four weeks before the shooting, the Defendant purchased a handgun and took it home. The handgun remained inside the Defendant's bedroom until December 9, at which time the Defendant placed the handgun inside the glove box of the orange car. On December 11, while he was at home, the Defendant received a telephone call, during which he heard an altercation between his mother and the victim. The Defendant testified that he knew his mother was being "beat on" by the victim and that he drove to Lonsdale where the altercation had occurred. The Defendant testified that he removed the handgun from the glove box before he left home to drive to Lonsdale and placed it in the console area. Based upon this evidence, we conclude that the Defendant possessed the handgun with the intent to go armed and that as a result, the record supports the trial court's determination that the Defendant was engaged in unlawful activity, albeit for a reason other than that found by the trial court.

Furthermore, the record supports a determination that a nexus existed between the Defendant's unlawful possession of the handgun and the Defendant's perceived need to engage in self-defense. *See Tyshon Booker*, 2020WL 1697367, at *27. The Defendant possessed the handgun while he and the victim engaged in an altercation, which continued after the Defendant had the opportunity to leave but did not. Ms. Logan testified that she saw the victim and Ms. Foster argue outside and that she heard the victim say the Defendant was not going to shoot me with "that F'ing gun." Ms. Logan saw the Defendant holding the handgun and telling the victim to "stop disrespecting" Ms. Foster during the verbal altercation between the Defendant and the victim but before the Defendant returned to the orange car. Ms. Logan did not witness a physical altercation and returned to her home to call the police. Based upon this evidence, we conclude that a causal connection, or nexus, existed between the Defendant's unlawful activity and the killing. As a result, the trial court properly instructed the jury that the Defendant had the duty to retreat before engaging in self-defense. He is not entitled to relief on this basis.

-32-

### III. Photograph of the Victim

The Defendant contends that the trial court erred by permitting the State to admit a portrait-style photograph of the victim with his two minor children before the incident in this case. He argues that the photograph was irrelevant and not probative of any factual dispute, noting that the only issues to be decided at the trial were why the shooting occurred and the type killing that occurred. He, likewise, argues that the photograph was a "clear appeal to sympathy, which was unnecessary and prejudicial," and that as a result, was inadmissible pursuant to Tennessee Rule of Evidence 403. He asserts that it was not "mere coincidence" that the photograph depicted the victim "holding two happy children." The State responds that the photograph was relevant to show the victim's general appearance and condition while alive, including his "slight stature," and to show the victim was the deceased person at the scene. Likewise, the State asserts that the probative value was not substantially outweighed by the danger of unfair prejudice.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

In determining whether evidence, including photographs of a homicide victim, is relevant and admissible, a trial court "should consider the questions of fact to be presented to the jury and any evidence presented during the course of the trial." *State v. Adams*, 405 S.W.3d 641, 657 (Tenn. 2013); *see State v. Williamson*, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995); *State v. Dulsworth*, 781 S.W.2d 277, 287 (Tenn. Crim. App. 1989). A trial court's decision to admit a photograph is reviewed for an abuse of discretion and "absent an abuse of that discretion, will not result in the grant of a new trial." *Adams*, 405 S.W.3d at 657; *see State v. Young*, 196 S.W.3d 85, 105 (Tenn. 2006).

Our supreme court has "consistently cautioned" the State against admitting portrait-style photographs taken during a homicide victim's life. *Adams*, 405 S.W.3d at 657. The court has cautioned against the admission of such photographs as evidence "because typically they lack relevance to the issues [at] trial and because of their potential to unnecessarily arouse the sympathy of the jury." *Id.*; *see State v. Cole*, 155 S.W.3d 885, 911-12 (Tenn. 2005) (Although a "family photograph may be relevant to establish the victim's identity as the person killed," the photograph must be "relevant to an issue that the jury must decide before it may be admitted into evidence."); *see also Young*, 196 S.W.3d at 106 ("In assessing probative value, the court must understand the proof and theory of the case, and whether there is a *real dispute* about the issue the evidence is to prove.") (emphasis in original) (internal quotation and citation omitted); *State v. Nesbit*,

978 S.W.2d 872, 902 & n.3 (Tenn. 1998) (stating that photograph evidence may be inadmissible "where the victim's identity has already been proven" because "further proof may be cumulative and, therefore, inadmissible").

However, pursuant to The Victims' Bill of Rights, "an *appropriate* photograph" of a homicide victim while alive "shall be admissible evidence when offered . . . to show the general appearance and condition of the victim while alive." T.C.A. § 40-38-103(c) (2019) (emphasis added). However, the admissibility of such photographs remains subject to the Tennessee Rules of Evidence. *See State v. Glenn Allen Donaldson*, No. E2019-00543-CCA-R3-CD, 2020 WL 2494478, at *10 (Tenn. Crim. App. May 14, 2020) (stating that although the statute requires the admission of a photograph, a trial court "retains the discretion to determine whether the photograph . . . is appropriate" and "may nevertheless exclude a photograph even if relevant to the show the victim's 'general appearance and condition' . . . if the court determines that 'its probative value is substantially outweighed by the danger of unfair prejudice[.]'" (quoting T.C.A. § 40-38-103(c), Tenn. R. Evid. 403)), *perm. app. denied* (Tenn. Sept. 9, 2020). As a result, a photograph even if relevant to showing a victim's general appearance and condition during life should be excluded as inappropriate if its probative value is substantially outweighed by the danger of unfair prejudice. *Id.*

During Mr. Gary's testimony, the State sought to introduce a photograph of the victim with his two young children. The photograph depicted the victim holding the younger child and the older child standing in front of the victim. The Defendant objected on the basis of relevance because the State had already established that the victim "was alive before his death." Trial counsel argued that pursuant to *State v. Adams*, 405 S.W.3d 641 (Tenn. 2013), "this sort of evidence is only relevant if there is a genuine dispute over whether the decedent was, in fact, alive . . . at the time of the death." Counsel offered to stipulate that the victim had been alive. The prosecutor argued that the "Victim's Rights Act" allowed "the victim in this case to put in a picture of their family -- of their deceased family member." The trial court stated, "When the victim is deceased, the Court will allow one picture. You can show the jury -- they've already seen it. It's been on the screen."

The prosecutor's stated purpose of the photograph of the victim and his young children was that she was permitted to present a photograph pursuant to the Victims' Bill of Rights. Although inarticulate, the intended purpose of the photograph was to show the victim's general appearance before his death. Any other assertions by the State regarding the intended purpose were not raised at the trial and will not be considered on appeal. Upon a relevancy objection, the trial court failed to engage an analysis of whether the probative value of the victim's general appearance before death was substantially outweighed by the danger of unfair prejudice to the Defendant. *See* Tenn. R. Evid. 402, 403. The court merely stated that in a homicide case, the court allowed one photograph of a victim. This carte blanche approach, without a determination of the appropriateness of the photograph pursuant to Tennessee Rules of Evidence 402 and 403, was improper.

Although the statute reflects that a photograph of a homicide victim shall be admissible when offered to show a victim's general appearance, the statute does not permit admission of a photograph that appeals to the jury's emotions and sympathies. *See* Tenn. R. Evid. 403. Ms. Logan testified that the victim's children were ages six and eleven at the time of the victim's death. However, the photograph depicts the victim's children years younger. The record does not reflect why the State selected this photograph rather than a photograph depicting the victim alone or a photograph depicting the victim and his children near the time of the shooting. *But cf. Glen Allen Donaldson*, 2020 WL 2494478, at \*10 (A photograph of the victim standing alone and smiling was not prejudicial to the defense); *State v. Randall Kenneth Reed*, No. E2019-00771-CCA-R3-CD, 2020 WL 5588677, at \*25 (Tenn. Crim. App. Sept. 19, 2020) (A photograph of the victim seated at a table was not prejudicial to the defense), *perm. app. denied* (Tenn. Feb. 5, 2021). Although we are concerned about the possibility of the photograph appealing to the jurors' sympathies and emotions in connection with the victim's children, we cannot conclude that the probative value of the victim's appearance before death was substantially outweighed by the danger of unfair prejudice to the defense. The Defendant admitted shooting the victim, and the primary issue for the jury's determination was whether the Defendant killed the victim during the exercise of self-defense or defense of his mother. Therefore, any error by the trial court in its failure to consider the appropriateness of the photograph was harmless because we cannot conclude that the photograph more likely than not impacted the outcome of the trial.

In reaching this conclusion, we have not overlooked the Defendant's argument that the State's general use of unfairly prejudicial photographs will rarely result in the appellate court's granting a new trial because any error in the admission of a photograph is subject to a harmless error analysis and that, as a result, the State has an incentive to seek admission of such prejudicial photographs. We understand the Defendant's concern. The prosecution has an obligation and the responsibility to present only admissible evidence for its intended purpose, and the trial court has an obligation and responsibility to undertake the proper analysis to determine whether the prosecution's evidence is both relevant and admissible. Each issue raised on appeal regarding the admission of the victim's photograph is reviewed by this court in the overall context of the exhibit's significance in the case. As a result, the Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-35-